## THE MARIE ANNA.
### No. A-16006.

District Court, E. D. New York.
Feb. 10, 1941.

Melton, Lebovici & Arkin, of New York City (Herbert Lebovici, of New York City, of counsel), for libelants.

Shearman & Sterling, of New York City (John A. Wilson, Horace M. Gray, and Gilbert Kerlin, all of New York City, of counsel), for respondent.

BYERS, District Judge.

This cause was instituted by five sailors and the cook of the auxiliary schooner yacht Marie Anna, to recover for wages, transportation, subsistence, penalties, etc.

An answer having been filed, the cause came to trial on December 20, 1940, when an amended libel was filed, in which the claim for penalties was abandoned, and it was asserted that the libelants were entitled to recover for wages, transportation, subsistence, damages, etc., amounting in all to $8,000, made up as follows:

Three days' wages ............ $ 33.00
Wages to end of voyage, from August 15, 1940, to April 23, 1941 ...................... 2,734.02
Maintenance for time spent ashore since date of alleged discharge .................. 1,639.00
Transportation to Dubrovnik, Yugoslavia, at $600 per man .. 2,400.00[1]

The Marie Anna is a three-masted schooner rigged yacht, of American flag and registry, having a single screw auxiliary Diesel motor of 175 horse-power. She is 120 feet long on the water-line and 172 feet over-all, and has a beam of 24 feet, and her gross tonnage is 147 and her net 139.

These libelants signed on at Dubrovnik, Yugoslavia, on April 24, 1940, of which country they are natives. The articles are in English but were translated by a competent official and, according to the testimony, were understood by the men. They are as follows:

"Dubrovnik2,[2] (Yugoslavija) 24.4.40
"Agreement

"We the undersigned members of the crew agree to serve on the Yacht 'Marie Anna' on a voyage from Dubrovnik2[2] to Naples, and Florida U.S.A. and to any port the master may deem necessary, for the period of twelve months and/or in the event of the yacht being laid up, and any member of the crew being paid off, his passage to be paid back to Dubrovnik2,[2] and wages to continue until date of arrival.

"In the event of any member of the crew dissbehaving[2] himself he will be liable to be paid off at any port the master deems necessary. Also in this case the home passage to be paid.

"All members of the crew to conduct themselves in a proper manner, and to obey the lawfull[2] instruction of the master.

"All members of the crew to assist each other when necessary, no smoking allowd[2] on deck or in boat during working hours.

"The crew to be reasoneble[2] found by the master and fresh vegatables[2] when obtaineble.[2]

"All clothes supplied are owners property, and must be left on-board when leaving."

The wages are stated on a weekly basis but there is no provision that they were payable weekly or otherwise, or prior to the end of the voyage.

The vessel arrived in Charleston, South Carolina, about July 10, 1940, and eleven weeks' wages had then been earned by the libelants; a draw of $5 was then paid to each member of the crew without comment or objection.

On July 30th, the vessel arrived at Whitestone, New York, at which time thirteen weeks' wages had been earned, of which nine were paid.

That fact is stated to have been a cause for grievance on the part of the libelants.

On Saturday, August 11, 1940, the yacht arrived in Oyster Bay, where she came to anchor, and the non-payment of the four weeks' wages seems to have been the subject of discussion among the crew and with the master.

It should be stated that the owner, Audrey Emery Djordjadze, was on board during this entire time, as was her husband, Prince Dmitri Djordjadze, who acted as the spokesman for his wife.

The owner and her husband had been advised by the Yugoslavian Consul, when he visited the yacht in Charleston to attend to formalities concerning the papers of the members of the crew as foreign seamen, that under the law of Yugoslavia the owner had the right to withhold, at all times and until the crew was finally paid off at the end of the voyage, four weeks' pay, as a precaution to guard against the men's jumping the ship.

---

[1] 6 x $600 would be $3,600.

[2] As is.

Whether that was sound advice or not requires no present discussion or decision, and reference to it is made merely to explain the situation as it existed on August 12, 1940, when these six libelants announced their intention of going ashore in a body, leaving the vessel at anchorage while they visited New York, ostensibly to see the Yugoslavian Consul in reference to this subject.

I am satisfied that the owner believed that she was acting within the law of Yugoslavia as to the four weeks' wages, and that it was her duty to prevent the men from entering this country illegally by abandoning their employment while in these waters.

The crew of the yacht consisted of the captain, mate, engineer, steward, and cook; and the five seamen who, with the cook, comprised the libelants.

Babajko signed on as boatswain, and his wages were £3 5s a week, as contrasted with the other men, whose wages were £3.

He professed on the trial that the designation of boatswain was not of his seeking, but the fact is that he recruited the five other men as seamen because they were friends and neighbors of his and he believed them to be competent. The impression that he gave as a witness was, that he was satisfied with the authority and extra pay of his position, but was reluctant to admit any coincident responsibility.

On Monday morning, August 12th, these six men were called at six o'clock, and the cook prepared their breakfast, and at eight o'clock they all appeared on deck in their shore clothes, and announced to the mate that they proposed to go ashore and visit the Yugoslavian Consul in New York; the mate informed them that they could not do so without the consent of the captain and that he would report to the latter; this he did, and the captain forbade them to go ashore.

The men thereupon returned to their quarters and failed to turn to, and that condition persisted on Tuesday and Wednesday, the 13th and 14th, on which latter date a representative of the Yugoslavian Consul came to the vessel and interviewed the men.

On the 15th the men were paid their wages in full through August 11th, but the owner and the master refused to pay them for the 12th, 13th and 14th, because on those days they failed to turn to; having received their wages, these men then left the yacht, and the original libel was filed with alacrity two days thereafter.

The sole issue that requires determination is whether the men quit the vessel of their own volition, thereby severing all relations with it and the owner.

If that was what took place, clearly they are not entitled to maintain this cause.

On the other hand, if they were discharged by the owner for misconduct called in the articles "dissbehaving", then they were entitled to be paid off at any port, and their passage home must be awarded to them. If they were discharged without cause, their remedy is more extended.

For the libelants it is argued that, even though they quit the vessel of their own volition, if they were induced thereto by threats or oppressive treatment or misrepresentation, their departure may not be regarded as a voluntary act, but should be treated as a discharge without cause.

The libelants' testimony was that of Segaric, the cook, Levacic, a sailor, Baranic, a sailor, and Dinko Babajko, the boatswain.

For the claimant, the witnesses called were the husband of the owner, the captain (Hitchens) and Mr. Gilbert Kerlin associated with the proctors for the claimant, who interviewed the dissatisfied crew on board the yacht on Tuesday, August 13th, and again when they were paid off on Thursday, August 15th.

With a lack of professional circumspection which fortunately is rare at the admiralty bar, the proctor for the libelants urges in his brief that Mr. Kerlin's testimony is vulnerable respecting its credibility.

Ordinarily a lawyer should not offer himself as a witness in his client's cause, but the circumstances in this case were quite unusual: These libelants obviously had only a smattering of English; they are Croatians, and the difficulty was apparent of communicating with them in an effort to ascertain the nature of their grievances. I am satisfied that Mr. Kerlin believed that some of them were sufficiently able to converse in French—which he speaks fluently—to enable him to act with fairness toward the men, and with intelligence toward the client of his office; and that his purposes were wholly constructive in conducting the interview which he did on Tuesday evening, August 13th, with these men as a group in the forecastle of the yacht. The steward spoke French and also Croatian. He acted as interpreter and was the

medium of communication between Mr. Kerlin and the disaffected members of the crew.

I am further satisfied that in giving his testimony he was entirely mindful of his obligations to the Court to speak with entire honesty and candor, and it is a source of regret that counsel for the libelants has seen fit thus wantonly to reflect upon his evident good faith.

The sole requirement is to ascertain from the evidence what was in the minds of these libelants and their employer on August 15, 1940, when they left the yacht, and the process is deemed to have demonstrated the following:

(a) The libelants asserted that they considered themselves aggrieved because of the non-payment of the said four weeks' pay on July 30th, and it is a reasonable inference that one or more of them were in communication with relatives or ostensible friends from and after the arrival of the yacht in these waters.

(b) This mental attitude was the ostensible reason for their decision to go ashore in a body on August 12, 1940, and to refuse and fail to turn to on that day and thereafter and until they left the yacht on the 15th.

(c) They acted in concert in response to a compact which had its origin on or shortly prior to Monday morning, August 12, 1940, before 8 a.m., whereby they failed and refused to turn to on August 12th, 13th, 14th and 15th.

(d) They left the yacht of their own volition on August 15, 1940, and in the face of efforts to persuade them to the contrary.

(e) They were not coerced into quitting the vessel by any act or omission on the part of the owner or the master.

It is concluded, therefore, that having so elected and so acted they voluntarily terminated their employment and thereby relinquished any claims to compensation from and after August 11, 1940, and to transportation to the city whence they had commenced the voyage, according to the articles signed.

## Discussion

For the libelants many contentions are advanced, which have not been ignored in reaching this decision. It is urged that the rights of the libelants are to be construed under the laws of this country; if that be conceded for argument, their cause is not advanced. Title 46 U.S.C.A. §§ 596 and 597, which cover the rights of a seaman to be paid "after the termination of the agreement under which he was shipped", and to payment of one-half of earned wages at ports, exclude by their terms, yachts and fishing or whaling vessels.

Seemingly there is no statute affecting the crews of excluded vessels; no reason is suggested for supposing that seamen employed on yachts are entitled to more frequent payment of wages than in the case of merchantmen.

In the Admiralty, the Courts are concerned for the just treatment of those proverbially designated as their wards, and so this controversy has been considered with that predisposition toward leniency, and in the effort to discover if these seamen were the victims of oppression. So far as their wages were concerned, at the time of this refusal to continue in their employment (August 12, 1940) they had earned approximately fifteen weeks' wages, and had been paid for nine, which was more favorable treatment than the law required for merchant seamen whose tasks, quarters, food and manner of life afloat can scarcely be favorably compared to what has been shown concerning these libelants.

It is urged that they should have been paid for the 12th, 13th and 14th of August, the days on which they refused to turn to. No authority is cited for that contention; nor has the Court been able to find any. It was the boatswain's duty to see that the men under him turned to at 8 o'clock on the morning of Monday, August 12th, and that thereafter they should perform their usual and customary tasks. The evidence discloses that they failed to do so; the cook failed to remove the remains of the breakfast that he served the crew, and the men failed to perform the customary duties of a deck crew on the yacht, such as polishing the brass and cleaning the decks, etc., and this work was done in part by the husband of the owner and some of his guests, while these men were reclining in their quarters, and smoking and loafing on their portion of the deck.

Further, that these men adopted the method of a sit-down strike during the three days in question, and it is clear that they did not become entitled to be paid for doing nothing, merely because they chose so to dispose of their time.

It is urged that they had the right to see the Consul of their own country, and to this it must be answered that the right was not

denied; they were informed by the captain that two of the six would be permitted to go ashore to see the Consul on Monday, August 12th, but with this they were not satisfied, insisting upon the right to make the visit in a body; thus Levacic (all testimony was through an interpreter):

"Q. Did you speak to the captain on Saturday (August 10th), Mr. Levacic? A. Yes, I did.

"Q. Tell us what the captain said to you and what you said to the captain. A. I told the captain: 'I am going to see the Consul and find out whether you have the right to keep from me those four weeks' wages.'

"Q. What did the captain say? A. 'It isn't possible.'

"Q. He said it was impossible? A. At the end he said, 'You may go Monday.'"

Babajko:

"Q. And did you have any other talk with him about anything on that Saturday (August 10th)? A. Yes, I told him, 'I am going to see the Consul.'

"Q. What did he say? A. He always said, 'That is impossible.'

"Q. He always said it is impossible? A. And then at the end he said, 'You can go.'

\* · \* ‡ \* \* \*

"Q. Finally he said you could go? A. At the end he said I could go."

Unavailing efforts were made, for the owner, to induce the Yugoslavian Consul to visit the yacht on Monday, but this could not be accomplished until Wednesday. If the owner had desired to discharge the men, it would have been an idle thing to endeavor to procure the presence of a representative of the Consul, whose sole mission was to conciliate these men and persuade them that they were not being treated unjustly.

Thus it was that two representatives of the owner's proctors visited the yacht on Tuesday afternoon, August 13th—one of them having been hereinbefore referred to—and they conferred with these libelants in the forecastle for an hour and a half, in an effort to ascertain what their grievances were, and how they could be adjusted.

As has been said, the steward acted as the interpreter, for he understood French as spoken by Mr. Kerlin, and he translated into the Croatian tongue, and then repeated in French what the men said.

Levacic thus testified concerning that interview:

"A. I told steward that he should tell to Mr. Kerlin that the conditions are very bad for us, and that they should be changed if they want us to stay on board.

"Q. What did the steward say? A. 'The captain doesn't look so bad.' If we go to Ellis Island conditions would be much worse for us.

"Q. Did anyone say that you were going to Ellis Island? A. We understood that much, that we should go.

"Q. Did you tell the steward what was wrong on board the ship? A. Yes.

"Q. What did you tell him was wrong on board the ship? A. That we did not receive the four weeks' wages.

"Q. And anything else? A. And when we are free, that the captain does not allow us to go ashore.

"Q. Was that all? A. Yes."

As to shore leave, it was shown that an offer thereof was made to these men on Sunday afternoon, August 11th, and declined.

Without quoting further from the testimony, it may be stated that the obvious purpose of Mr. Kerlin's interview with the men was to induce them to see that it was to their interest to abandon their hostile attitude and to resume the performance of their duties. Such an effort was incompatible with a determination by the owner to discharge the men.

Similarly, on the following day, a representative of the Yugoslavian Consul visited the vessel and interviewed each of the men and sought to ascertain from them what their real grievances were; thus Baranic:

"Q. What happened when you were called before the Consul? A. He asked me, 'What is the matter with you?' I said to him, 'It is impossible to say.' And he asked me why. 'I was not paid for the time I was working. I cannot go out to get a haircut, and we are not free, we are just like being in prison.'

"Q. Did the Consul say anything at that time? A. Yes. 'Whether you like to be on board, stay on board', and I answer him, 'Not under these conditions.'

"Q. Did the Consul say anything else at that time or did you say anything else? A. Yes, I said that I would stay on board if the captain is discharged.

894

"Q. Did the Consul say anything? A. The Consul said to Prince that all these men are going out probably just on account of the captain. 'I cannot help in any way.'"

From the testimony of these witnesses, it clearly appears that they had determined to leave the yacht, and carried that determination into effect when they received their pay, as has been stated, on August 15th.

The Consul so advised the husband of the owner and the latter said, in effect: "Well, let them go." Obviously, he could do nothing else.

It is urged that the discharge had in fact taken place on Monday morning, August 12th; of course there is no evidence whatever to sustain that conclusion. Probably the argument is presented in order to overcome the effect of the libelants' testimony, some of which has been quoted.

Reference is made to the fact that, following the refusal of the men to turn to on Monday morning, August 12th, the owner caused to be brought aboard two or three representatives of the local police, who stayed on the vessel. Clearly the owner had the right to select her own guests and, since there were two women on board and one child, this may have been a rational precaution against disorder. One of these officers spoke Russian and tried unsuccessfully to placate the men; at least one of them understood the Russian tongue.

There was, in fact, no disorder and, when the men left the vessel, it apparently was with pacific feelings toward the owner and her husband. During the three days of their failure to perform any duties, they were not deprived of food, although the effort was made to prove the contrary.

When the men left, they signed releases—to which no attention has been paid in the disposition of this cause. It is thought that they understood what they were doing, but the releases are deemed merely to be receipts in addition to what is shown by the captain's payroll, which each man signed when he got his money.

The entire record presents an unfortunate state of affairs which should never have ripened into a controversy, and probably would not have, had there not been at work some agency exterior to the yacht which induced the men to abandon their employment—for that is what they did.

The libel is dismissed on the merits. Settle decree.